# Richmond

## Town of Vinton v. City of Roanoke.

March 15, 1954.

Record No. 4169.

Present, Hudgins, C.J., and Eggleston, Spratley, Miller and Smith, JJ.

The opinion states the case.

*Hazlegrove, Shackelford & Carr* and *Walter W. Wood*, for the appellant.

*Ran G. Whittle* and *James N. Kincanon*, for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This appeal brings under review a decree construing the terms of a written instrument and adjudicating the rights and obligations of the City of Roanoke and the Town of Vinton thereunder. The instrument reads as follows:

"This Deed, made this 16th day of February, 1914, between the Vinton-Roanoke Water Company, Incorporated, of the first part, and the Town of Vinton, of the second part;

"WITNESSETH: that whereas, by a certain contract made on the 22nd day of January, 1914, between the aforesaid first and second parties hereto, the said first party did sell to the said second party the portion of the Water Works then

installed within said town and the immediate suburbs, as therein and hereinafter set forth, in consideration of the amount found to be due upon specific measurements, notations and inventory thereof, based upon the schedule of prices fixed and set forth in said contract, and

"WHEREAS, said measurements, notations and inventory have been duly made, and the total amount due therefor according to said schedule of prices ascertained—all of which is approved and accepted by the respective parties hereto, and

"WHEREAS, it appears, that the title to said property has been cleared of all liens and objections and other provisions of said contract complied with;

"Now THEREFORE THIS DEED WITNESSETH: that in pursuance of said contract, and in consideration of the premises, and of the sum of ($18707.10) eighteen thousand seven hundred and seven and 10/100 dollars (found to be due upon said measurements and inventory) in hand paid by the said second party to the said first party at and before the sealing and delivery of these presents, the receipt whereof is here duly acknowledged by the said first party, the said Vinton-Roanoke Water Company doth hereby grant, sell and convey unto the said Town of Vinton, with covenants of general warranty of title, all and singular its rights, title, privileges, franchise, water pipes, pipe lines, connections, meters, fire hydrants and other accessories and supplies complete, at this time installed and used in the operation and connection with the water plant, within the corporate limits of said town and along the Blue Ridge Road; said town being situated in the County of Roanoke, and State of Virginia—except the ten (10) inch main running through said town as now installed, and the ten (10) inch main from the stand pipe to said main, and the stand pipe or stand on the hill, also the eight (8) inch main from Tinker Creek and the Street Railway Bridge and extending along the south side thereof to Midway Crossing; and also the eight (8) inch main on the property of the said first party, known as the 'Smith Spring' and the pump.

"Said first party also reserves the right to lay its Water Mains along the Streets and Avenues in and through said town for the purpose of improving its plant, and of furnishing water to the Norfolk & Western Railway Company, under contract now in operation with said Railway Company, which is not here sold to said town but is expressly reserved by first party; but all other contracts and provisions for the furnishing and supply of water through pipes and accessories as herein above sold to said second party, hereby passes to said second party, said first party only retaining the right to supply the aforesaid Railway Company under its contract therewith as above set forth.

"And said first party also reserves the right to furnish water to such consumers within said town as are at this time connected with first party but who are inaccessible to said second party, and shall receive the rents therefor, until said second party shall become able to take over same, at which time, upon the written demand of said second party, first party will turn over to said second party the pipes and accessories used in such supplies, (Except such as are above expressly reserved) upon said second party paying to said first party the amount found to be due by measurements thereof at the same prices fixed in said contract for like pipes, meters, connections, etc.—said measurements thereof and prices and amounts therefor not being included herein.

"The said first party hereby covenants that it will furnish, through its mains, to said town, all water necessary to supply any and all demands, through the pipes and connections herein purchased or that said second party may hereafter install, at the rate of five (5) cents for each one thousand (1000) gallons, as long as said second party shall require the same to be furnished, to be paid monthly—

"Provided that the minimum charge therefor shall be thirty ($30.00) dollars, payable at the expiration of each month during the period same shall be supplied as aforesaid, and in case of default after ten days, said first party reserves the right to cut said water supply off and to *with hold* the

said supply until all arrears have been paid, and provided further, that in case said second party shall decide to discontinue the use of said water as aforesaid, said second party shall give said first party six months notice, in writing, prior to the termination of the use thereof of its intention to abandon same, and that said second party will be required to pay for said water, under this provision, for six months after said notice is given, when this provision shall be null and void as to furnishing water.

"Said first party further covenants that it will furnish its own meter through which said town is to be supplied from the eight (8) inch main, and if second party is to be supplied from any other point of first part*ies* mains, said second party will have to furnish such extra water as may be needed in such additional supply.

"And so far as it may be necessary for said second party to operate the lines and fixtures herein purchased, said first party covenants to relinquish and hereby transfers its franchise thereto to the use and benefit of said second party, and that hereafter neither the said first party, his assigns nor alienees shall have the right to install or operate any lines or water supplies that will interfere with said second party's uses, privileges and supplies within the corporate limits of said town, except as above provided and reserved.

"In Witness whereof, the Vinton-Roanoke Water Company, have hereby caused its name to be signed hereto and acknowledgement thereof to be made by C. Markley, its President, and its Corporate seal attached, and the same to be duly attested by W. L. Andrews, its Secretary, who is also authorized to acknowledge same;

"VINTON-ROANOKE WATER COMPANY
By C. Markley, President.

VINTON-ROANOKE WATER COMPANY
    SEAL

Roanoke, Va.      Attest:

        W. L. Andrews, Secretary."

The City of Roanoke will be hereinafter sometimes referred to as the City, and the Town of Vinton as the Town.

The City by conveyance and condemnation is a successor in title to the properties, rights and franchises of the Vinton-Roanoke Water Company, a public service corporation.

The controlling issue relates principally to the meaning and effect of the covenant to furnish water to the Town at the rate of five cents per one thousand gallons, "as long as" the Town shall require the same to be furnished.

The City brought this proceeding on November 30, 1948, for a declaratory judgment asking for an adjudication that it was not bound by the covenant either by contract or law. A demurrer to the original motion was sustained, with leave to amend. An amended motion was filed August 11, 1950. A demurrer thereto was overruled and the proceeding transferred to the equity side of the court.

The Town filed its answer October 6, 1951, in which it contended that the covenant to furnish water to it was not an independent covenant, but the principal, if not the sole, consideration for which "it paid the purchase price of the property" described in the deed; and was therefore "a covenant running with the land and *sine qua non* of the deed." It further averred that the instrument "contained no requirements or specifications as to the source of the water to be furnished it thereunder, and that the defendant has not undertaken and will not undertake the control of the source from which water is furnished it, provided such water is clean and wholesome and meets the required health standards." In its briefs and argument it contends that as a real covenant, it constituted "a servitude on Falling Creek and the ten-inch main for the benefit of the distribution system in Vinton."

The cause came on to be heard upon the pleadings and the evidence taken *ore tenus*.

On October 27, 1952, the chancellor rendered a written opinion, holding that the Town did not acquire by the deed of February 16, 1914, the perpetual right to receive or ob-

tain water from the Falling Creek water source, nor did it acquire any title or interest in or to that water source; that the covenant to furnish water to the Town did not run with the land, but was a personal covenant only and never binding upon any specific property of the Vinton-Roanoke Water Company or its successors in title; that the agreement being for an indefinite period of duration and lacking mutuality, it was terminable at any time by either party, or their successors, upon reasonable notice; that the Vinton-Roanoke Water Company, a public service corporation, could not by contract bind itself to furnish water without the approval of the State Corporation Commission; that the City of Roanoke, having acquired title to the water system by condemnation, became obligated only to furnish Vinton with water from its surplus water supply (*City of South Norfolk* v. *City of Norfolk*, 190 Va. 591, 58 S. E. (2d) 32); that the water now being furnished by the City to the Town is surplus water; and that the City is authorized to charge the Town for such water at such rate as may mutually be agreed on, or, in the absence of such agreement, at such reasonable rate as the City may determine, the rate not being subject to the approval of the State Corporation Commission.

Subsequent to the above ruling of the chancellor, and before the entry of a decree carrying it into effect, the City of Roanoke requested the court to further adjudicate that "by implied agreement between said City and Town, water was furnished said Town by said City from May 1, 1938, through January 31, 1949, at the rate of five (5¢) cents per 1,000 gallons; that from February 1, 1949, to the present time water has been furnished to said Town by said City at the effective and applicable rate established by Resolution No. 5627 of the Council of the City of Roanoke, as amended thereafter from time to time."

The Town requested the court to adjudicate:

"1. The Vinton-Roanoke Water Company did not acquire, by the deed dated February 16, 1914, any easement

or franchise right to install or maintain any of its pipe lines and accessories in or through the public streets, avenues, alleys, lanes or public grounds of the Town of Vinton.

"2. The franchise from the Town of Vinton to the Vinton-Roanoke Water Company, created by the Town Ordinance dated August 24, 1897, expired by the terms thereof on the 24th day of August, 1937.

"3. The City of Roanoke did not in the condemnation proceedings, instituted in 1938, condemn any easements or right to install or maintain water pipes and accessories in or through the public streets, avenues, alleys, lanes or public grounds of the Town of Vinton.

"4. The City of Roanoke does not have any easement or franchise right to install and maintain water pipes and accessories in or through the public streets, avenues, alleys, lanes or public grounds of the Town of Vinton."

The chancellor, on November 6, 1952, rendered his opinion holding that water was furnished the Town by the City from May 1, 1938, to January 31, 1949, by an implied agreement, at the rate of five cents per one thousand gallons; and that from February 1, 1949, water had been furnished to the Town at the effective and applicable rate established by the council of the City of Roanoke. He declined to make the adjudications requested by the Town, holding that they were not then actual controversies in issue, and that a decision thereon would be advisory only. *Patterson's Ex'rs* v. *Patterson*, 144 Va. 113, 131 S. E. 217.

A final decree in accordance with the opinion of the chancellor was entered on November 14, 1952.

The material facts are not in conflict, but the principles of law applicable are in dispute.

In 1914, the Vinton-Roanoke Water Company, a public service corporation, owned and operated a water distribution system in Vinton under a forty-year franchise granted by the Town in 1897. It owned then two sources of water supply, one called the Falling Creek Reservoir, located on a mountain east of Vinton, and the other called Smith

Spring, located in Vinton. In addition, it owned considerable acreage which constituted a water shed described as Beaver Dam, the name of a reservoir subsequently constructed. It had installed a complete distribution system in Vinton consisting of approximately three and one-half miles of large pipe, to which many small pipes, fire hydrants, meters, etc. were connected. The system included a ten-inch main, leading from Falling Creek Reservoir through the main street of Vinton for a distance of about one mile to the western corporate limits of the Town. It extended thence into the City of Roanoke, serving a portion of the residents of that City and the County of Roanoke. Smith Spring and an eight-inch main therefrom were operated only when the supply from Falling Creek Reservoir was not sufficient to meet the demand of customers.

The council of the Town of Vinton decided in 1914 that it would be to the benefit of the Town and its inhabitants to acquire and operate its own water supply and distribution system. It thereupon entered into negotiations with the Vinton-Roanoke Water Company, and as a result an agreement was reached which is evidenced by the written instrument dated February 16, 1914.

In 1925, Vinton-Roanoke Water Company leased all of its physical properties to the Roanoke Water Works Company, another public service corporation, which was serving water to the City of Roanoke. On December 31, 1931, the Town enacted an ordinance "authorizing" Vinton-Roanoke Water Company to sell and transfer to the Roanoke Water Works Company all rights, franchises and privileges granted to the first named company by the Town, provided the Roanoke Water Works Company undertook and agreed in the deed of conveyance to perform all obligations and duties assumed by the Vinton-Roanoke Water Company in the February 16, 1914, instrument. On the following day, Vinton-Roanoke Water Company conveyed all of its rights, franchises and privileges to the Roanoke Water Works Company, and in the deed of conveyance, the

grantee company undertook and agreed to assume the obligations and duties of the former company in accordance with the requirements of the said ordinance.

In 1938, after the expiration of the franchise granted Vinton-Roanoke Water Company by the Town of Vinton, the City of Roanoke acquired by condemnation title to all of the rights, properties, and franchises of the Roanoke Water Works Company, including those which the latter acquired from Vinton-Roanoke Water Company. The properties condemned specifically included Falling Creek Reservoir, the Beaver Dam area, and the ten-inch main running through Vinton. In the condemnation proceeding to which Vinton was not a party, the deed of February 16, 1914, was, at the request of Roanoke, brought to the attention of the court and the commissioners, and no additional compensation was claimed by or allowed the condemnee for the special value of Falling Creek Reservoir and Beaver Dam as sources of water.

The City, in order to obtain a sufficient supply of water and comply with health requirements, expended a large amount of money in acquiring new sources of water, and in installing modern equipment and appliances, and furnishing added services in connection therewith.

Vinton-Roanoke Water Company, Roanoke Water Works Company and the City of Roanoke, respectively, supplied water to Vinton until 1947, at the rate of five cents per one thousand gallons. That rate was never submitted to the State Corporation Commission of Virginia by either the Vinton-Roanoke Water Company, Inc., the Roanoke Water Works Company, the Town of Vinton, or any other party, nor approved by the said Commission. Constitution of Virginia, § 156; Title 56, Chapter 10, Code of Virginia, 1950.

In 1947, the City undertook to negotiate with Vinton a new water rate schedule without avail. It caused to be delivered to the Mayor of Vinton in July, 1948, a resolution notifying the Town that the sale of water at five cents per thousand gallons would be terminated on February 1, 1949,

unless prior to that date Vinton had applied for service at the general rate established by the City. Vinton refused to make such application, or to pay more than the old rate. Thereupon this proceeding was instituted.

It developed in the evidence that at the time of its agreement with Vinton in 1914, the Vinton-Roanoke Water Company owned only a one-half undivided interest in the Falling Creek Reservoir properties, and held the remaining undivided interest as a leasehold tenant for a term of fifty years. The outstanding interests were subsequently acquired by the City of Roanoke. Vinton uses approximately one-sixth of the water distributed by the ten-inch main. It obtained its water through a meter on an eight-inch main connected with the ten-inch main.

We agree with the learned chancellor of the trial court that the instrument of February 16, 1914, is divisible in its provisions, and that it constitutes a deed so far as it conveyed the water distribution system and the accessories within Vinton to the Town, and that it is only a contract insofar as it provided for the sale of water. A fixed sum of money was the consideration for the sale of the distribution system ascertained according to a schedule of prices for specific items. No part of that sum was specified to be in consideration of the grant of a right to a supply of water. The covenant to furnish water was a separate promise or contract on the part of the water company, personal in character and collateral to the sale of its property.

No water supply or water source other than Smith Spring was expressly described, identified, or mentioned in the so-called deed. The water company did not agree to furnish the Town water from Falling Creek Reservoir or from any particular source. In its answer, Vinton recognized this in the averment that the 1914 instrument "contained no requirements or specifications as to the source of the water to be furnished it thereunder, and that the defendant has not undertaken and will not undertake the control of the source from which water is furnished it, provided such water is

clean and wholesome and meets the required health standards."

There are no words in the deed of 1914 to indicate intent on the part of Vinton-Roanoke Water Company to supply water to Vinton after the expiration of its franchise in 1937. The Roanoke Water Works Company assumed only the obligations of the Vinton-Roanoke Water Company. It was impossible to foretell what conditions might arise in 1937, whether a new franchise might be obtained, what would be the terms of such franchise, or who would obtain it. There was no provision that Vinton was bound to take or the company bound to furnish water for any specified time, or from any specified source. The ten-inch main was only the means of supplying the eight-inch main through which the Town obtained its water. The covenant to furnish water was a separate and specific contract as to price of water; as to minimum charge, if any water was taken; as to default in payments; and right of termination.

Under the instrument of February, 1914, the Town is given no easement or right on or in Falling Creek Reservoir or on or in the ten-inch main leading therefrom to the Town. The water company expressly reserved from the sale the ten-inch main running through the Town, as well as the eight-inch main on its Smith Spring property.

There is no servient tenement described or identified upon which a servitude to furnish water was imposed. The water could have been supplied by the grantor from any source then existing or thereafter acquired, or from any one of its mains. The Town could have connected its distribution system to any other water source owned by the Town or by some other party.

It is almost impossible to lay down any precise rule, in the absence of statute, as to what covenants run with the land and what covenants do not run with the land. When a covenant or an easement is imposed on land, there must be a servient tract, and the tract must be described or identified in the instrument involved.

In *Tardy* v. *Creasy*, 81 Va. 553, pages 556 and 557, an easement is defined as "a right which is appurtenant to the dominant tenement, and imposed upon the servient tenement; and it is important to mark that it is not imposed upon the person of the servient owner; therefore, an obligation upon him to do something for the benefit of the dominant tenement is not an easement."

It is settled that in order for a deed to affect property in any way, there must be therein some description or identification of the property claimed to be affected. *Merritt* v. *Bunting*, 107 Va. 174, 178, 57 S. E. 567, 12 Ann. Cas. 954; *Smith* v. *Bailey*, 141 Va. 757, 768, 127 S. E. 89.

In *Coulter, et al.* v. *The Sausalito Bay Water Co., et al.*, 122 Cal. App. 480, 10 P. (2d) 780, at page 785, dealing with the point in issue, this is said:

"Plaintiffs claim that the agreement in question was more than a personal covenant and created a covenant within the above section which ran with the lands of the Water Company. But the Water Company made no agreement to do or to refrain from doing anything on its own land, and its right to furnish the water from any source was unrestricted. Further, it appears that during the whole period no water was conveyed directly from any spring on the land of the company to the plaintiffs' property, but, first to the street mains, from which the plaintiffs with others obtained their supply. As has been said with respect to the provisions of contracts creating building restrictions claimed to be covenants running with the land, if parties desire to create mutual rights in real property they must say so and must say it in the only place where it can be given legal effect, namely, in the written instruments exchanged between them, which constitute the final expression of their understanding * * * (cases cited); and a provision in an instrument claimed to create such a servitude is strictly construed, any doubt being resolved in favor of the free use of land. 77 Cal. Jur. Covenants, § 19, p. 733. As stated, the agreement contained no reference to the lands of the company, and the

method of supply indicates no intention to impose more than a personal obligation to furnish water."

The consideration, that is, "purchase price" paid by Vinton for the properties acquired by it was a total sum found due "according to schedule of prices ascertained" by "specific measurements, notations and inventory thereof." The covenant to supply water is not mentioned in the clauses reciting the consideration or describing the rights and property sold, nor does the covenant itself make any reference to the consideration fixed as the price for the specific property sold.

We find no great difficulty in concluding that the covenant for the sale of water was a personal covenant on the part of the grantor, collateral to the sale of the properties described, as distinguished from a real covenant.

In *Jeter* v. *Vinton-Roanoke Water Co.*, 114 Va. 769, 76 S. E. 921, a condemnation case decided thirteen months prior to the date of the 1914 instrument, is an interesting historical review of the Vinton-Roanoke Water Company. We there held that as it was a public service company, its properties were held subject to a trust in favor of the public it served, and said at page 779, "Where a use is public a trust attaches to the subject condemned for the benefit of the public, of the enjoyment of which it cannot be deprived by the company without reasonable excuse, and the State retains the power to regulate and control the franchise and to fix rates. *Zircle* v. *Southern Ry. Co.*, 102 Va. 17, 45 S. E. 802, 102 Am. St. Rep. 805."

A municipality in Virginia does not have unrestricted power to fix the rates of public service corporations. The reservation to the State of the police power, and the express right to regulate and prescribe such public utility rates in sections 156, 159 and 164 of the Constitution cannot be defeated or abridged by any contract made by a municipality; but such contracts must be construed as subordinate to the reserved power of the State. *Town of Victoria* v. *Victoria Ice, Light & Power Co.*, 134 Va. 134, 155, 114 S. E. 92; *C. & P. Tel. Co.* v. *Com.*, 147 Va. 43, 136 S. E. 575.

Thus, it seems clear that the Vinton-Roanoke Water Company could not by a simple written agreement with Vinton bind itself and its successors in perpetuity to a rate for water not charged by the company to the remainder of the public which it served, and enforce that agreement by a covenant made to run with its property, already subject to a larger public use. Moreover, it could hardly bind itself, and much less its successors, if any, beyond 1937, when its franchise with the Town of Vinton expired.

We have been cited to no case in which the facts are indentical with those under review. In the cases cited by the Town in support of its contention that the covenant was real, the written instruments involved either expressly designated the dominant and servient tenements, or the decisions were controlled by some statute. In none of the cases were the properties in question impressed with a public trust.

We further agree with the chancellor below that, as a personal contract, the agreement to furnish water to the Town was not perpetual. It was a covenant to sell an undetermined quantity of water at a fixed price for an indefinite period. It was subject to release at the will of the Town at any time upon six months notice. The words "as long as" convey a meaning of "temporarily," that is "for such a time." The word "perpetual" is defined in Webster's New International Dictionary, 2d Ed., as meaning "time without end," its usual meaning in ordinary and common acceptation.

"When a contract calls for the rendition of services and it is so incomplete that its intended duration cannot be determined by a fair inference from its terms, either party is, as a rule, entitled to terminate it at will after reasonable notice of his intention to do so." 4 M. J., Contracts, § 72, page 429.

See *Stoneqa Coal, etc., Co.* v. *Louisville R. Co.*, 106 Va. 223, 55 S. E. 551, 9 L. R. A. (N. S.) 1184.

In *Dover Copper Mining Co.* v. *Doenqes*, 40 Ariz. 349, 12 P. (2d) 288, 292, this statement is quoted with aproval.

"An agreement to furnish a support or service, or a particular commodity, at a specified price, or to do a certain thing

without specification as to time, will be construed either as terminable at pleasure, or as implying that the thing to be done shall be performed within a reasonable time, and the obligation will cease within the same limitation.' "

In Williston on Contracts, Revised Edition, Vol. 1, page 104, we find this:

"In many cases, however, a promise which contemplates continuing performance for an indefinite time has been interpreted as stipulating only for performance terminable at the will of either party."

See also *Stutzman* v. *Nash & Son*, 189 Va. 438, 53 S. E. (2d) 45; *Childs* v. *City of Columbia*, 87 S. C. 566. 70 S. E. 296; *Barney* v. *Indiana Ry. Co.*, 157 Ind. 228, 61 N. E. 194.

Here, the covenant under review lacks mutality of promises, in that it purports to bind Vinton-Roanoke Water Company to furnish all water necessary to supply the demands of the Town, but does not bind the Town to take any amount of water.

"The general rule of law is, * * * that where the consideration for the promise of one party is the promise of the other party there must be absolute mutality of engagement, so that each party has the right to hold the other to a positive agreement. Both parties must be bound or neither is bound." *Am. Agricultural Co.* v. *Kennedy*, 103 Va. 171, 176, 48 S. E. 868.

In *Town of Laurens* v. *Northern Iowa Gas & Elec. Co.*, 282 F. 432, 435, where the facts are somewhat similar to those in the case at bar, the court said that "Fundamentally, an executory agreement for the sale and delivery of goods or supplies, to be effective, must be obligatory on both parties, or it lacks mutuality and is not enforceable."

There is no merit in the contention that the chancellor erred in allowing the City to introduce evidence concerning the cost of operating its water system and its charges for water to other customers. It is apparent from the record and the written findings of the chancellor that the court did not take into consideration any of the evidence which was ad-

duced by the parties with respect to the cost of water furnished to the Town or other consumers.

The Town further contends that the trial court should have determined what rights, if any, Roanoke has to maintain and to continue to use the ten-inch main in the streets of Vinton, since the franchise of Vinton-Roanoke Water Company expired in 1937. The trial court property held that since this question and the other questions submitted by the Town subsequent to the court's opinion of October 27, 1952, were not actual controversies put in issue by the pleadings, and the City had not had an opportunity to admit or deny the allegations, any determination by it at that stage of the proceedings would be advisory only. Consequently, there has been no ruling on the merits of these questions, and they are not properly before us for review or decision.

At the conclusion of the evidence the following colloquy between the court and counsel took place:

"By the Court: 'As I see it right now the question before the Court is to determine whether the contract entered into in 1914 is a valid contract or not, and whether it's still binding on the City; and if that is the issue.'

"By Mr. Wood: (Counsel for the Town) 'That's the sole issue.'

"By Mr. Whittle: (Counsel for the City) 'The issue is, if your Honor please, as the City sees it, that it was never binding on the City.'

"By the Court: 'I understand that. And a whole lot of the evidence that's been put on here in these two days on that particular issue is really not material; it's explanatory of what grew out of the contract, but it's not material as to the interpretation of it or to its legal effect.' "

Finally, the Town argues that it should not be charged retroactively a price which it never agreed to pay, that the rate charged by the City was unreasonable, and that the delay in prosecuting the proceeding imposes a hardship upon it. The answer to this argument is, there appears to have been no effort on the part of either party to expedite the hearing.

The Town had notice when the proceeding was brought that the City demanded a higher rate. It could have negotiated with the City, or it could have arranged to discontinue the water service. The decree does not undertake to determine the reasonableness of the rates. It contains no adjudication that any fixed rate would be reasonable. Vinton knew the amount which the City demanded, and expected to be paid, in the event its position was upheld. The adjudication has not deprived Vinton of its right to bargain and make agreements in its own behalf, nor required it to purchase water from the City's system.

Upon the whole case, we are of opinion that the decree of the trial court should be affirmed, and it is so ordered.

*Affirmed.*